**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MARGERY BURFIELD,

    Plaintiff,

vs.                                                 CIV 00-990 KBM/DJS – ACE
                                                              *Consolidated With*
BRUCE BABBITT, Secretary of the                   CIV 01-199 KBM/DJS – ACE
UNITED STATES DEPARTMENT
OF THE INTERIOR,

    Defendant.

# **MEMORANDUM OPINION AND ORDER**

These matters were recently consolidated on Plaintiff's unopposed motion. Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. Given consolidation, the matter is before the Court on what will now be Defendant's motion for partial summary judgment. *Doc. 31.*

Having reviewed the memoranda and relevant authorities, I find Defendant's motion well-taken and will dismiss Plaintiff's Title VII and Age Discrimination in Employment Act claims. This disposition leaves only Plaintiff's appeal of the decision by the Merit Selection Review Board ("MSRB administrative review claim") which will be decided on the administrative record following further briefing by the parties.

## **I. Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that it is the movant's burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Upon such a showing, the

> adverse party may not rest upon the mere allegations or denials of the [movant's] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial*. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Id.* at 321-23 (emphasis supplied). Moreover, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Id.*

## II. Factual Background

I have carefully reviewed all of the briefs and supporting materials. Unless otherwise noted, following facts are undisputed.

Plaintiff Margery Burfield worked with different federal offices since at least 1978. In 1994, William Radke, Manager of the Bitter Lake National Wildlife Refuge (hereinafter "Refuge"), hired her as an office assistant when she was 55 years old. Radke gave Plaintiff favorable evaluations and/or performance awards in 1994, 1995, and 1996. *E.g., Doc. 32,* Radke Declaration at ¶ 11 (hereinafter "*Radke Decl.*").

During these years, the Refuge work posed two major challenges for Plaintiff. First, the office was not highly automated, particularly with respect to the communication lines and computer network system. *See Doc. 34,* Exh. 1 at 6 (hereinafter "*Plf. Aff.*"); *Radke Decl.* (Attachment A). Second, the Fire Management Office was due to move into the same space occupied by the Refuge in the Spring of 1996. *See Plf. Aff.* at 8. According to Burfield, she had plenty of work to do and willingly worked at home and on weekends in anticipation of things

2

improving once the network was improved. At home and on weekends she was also working on a "network plan" for her "college project in Networking." She apparently was working in some capacity with a new communications/network at the office and hoped that her college project would benefit the office as well. *See id.* at 2, 6; *Plf. Depo.* at 43-44, 53.

### A. *Radke Observes A Change In Plaintiff's Performance*

Problems with Plaintiff's job performance and resulting tension with Radke began in late 1996. In his declaration, Radke states that

> during the autumn of 1996, I began to notice multiple problems relating to [Plaintiff's] inability to prepare budget reports, to adequately manage the imprest fund, to distribute electronic mail, to meet deadlines, and to retrieve important materials from the refuge file system. This was the first time I had ever noticed serious performance problems by the Plaintiff, and I began to closely monitor the situation.
>
> By January 1997 the problems had not improved, and I began to wonder if there were personal problems I was not aware of that were contributing to the poor performance. I asked [Plaintiff] this question, but she indicated there was no problem and had simply gotten behind due to the holidays. While it seemed apparent to me that something had happened that affected her work performance, I could only guess at the possible causes.

*Radke Decl.,* ¶¶ 11-12. Plaintiff has not come forth with evidence disputing that her performance in fact changed at that time. Indeed, in a later grievance Burfield acknowledged having problems completing tasks. *See Radke Decl.,* ¶ 16. Rather, Plaintiff focuses on the several "upsetting" incidents during that time which she feels are indicative of a discriminatory animus.

### B. *1996 Denial of Upgrade To GS-7 Upsets Plaintiff*

Plaintiff contends that for a "long" time, Radke had "promised" her an upgrade from GS-6 to GS-7 and an assistant to help her with her work. *Id.* According to Radke, sometime in 1996

3

he "discussed with [Plaintiff] the possibility of increasing her grade . . . based on an anticipated increase in her workload," presumably meaning after the Fire Office moved in. *Radke Decl.* ¶ 3. Yet, it is immaterial whether Radke promised or discussed a future grade raise because only Assistant Regional Director Joseph Mazzoni possessed the authority to approve a grade raise. Mazzoni was unwilling to approve a grade raise for Burfield because he believed a GS-7 was not warranted for an office assistant position and would set an undesirable precedent for the region. *Id.* at ¶¶ 3-5.

Plaintiff first learned in October or November 1996 that she would not be given a grade increase. She speculates that her grade increase request was denied because Radke "wanted to make room to hire a younger male, Kenneth Roberts" who was hired for a newly-created GS-5 assistant position. *See Plf. Aff.* at 6, 8. Plaintiff acknowledges that she did not apply for the newly-created position and that Roberts' GS-5 position would have been a demotion for her. *Radke Decl.* ¶ 5; *Doc. 32,* ¶ 8. Nevertheless, Burfield complained to Radke that Roberts' hire in the context of the refusal to promote Plaintiff constituted unfair treatment based on gender.[1] *Plf. Depo.* at 42.

In December, Radke assigned the network/communications project to Robert Larranaga, a male under the age of forty. Plaintiff does not dispute that she was not making sufficient headway on the project. *See Radke Decl.* ¶ 6; *Plf. Aff.* at 2. Nor does she contend that she desired, expected and/or applied to take on management of the new network at that time. Rather,

---

[1] Plaintiff also alleges that in March 1998, Roberts "was placed in a career path" that offered him "opportunities" for advancement. *See Complaint CIV 00-990,* ¶ 10.j.; *Complaint CIV 01-199,* ¶ 20. Although Burfield alleges that she also wanted promotions and would have welcomed a similar career opportunity, she does not allege that she requested a promotion at that time.

4

Plaintiff asserts that a $925.00 cash award given to Larranaga, who completed and implemented the project, evidences discriminatory treatment and motive. *See Complaint CIV 00-990,* ¶ 10.c.; *Radke Decl.* (Attachment A).[2]

### C. The March 1997 Interim Negative Performance Evaluation

Radke and Plaintiff offer two different versions of what occurred during the March 1997 performance evaluation meeting, but neither disputes what the other contends.

According to Radke, Plaintiff still "was not achieving four of her five work elements." He told Burfield that he "was not trying to get her in trouble, but she was not doing her job." They discussed his "expectations regarding her performance along with specific ways in which she needed to show improvement" while she "took extensive notes" of their discussion. *Radke Decl.* at ¶ 13.

According to Plaintiff, she learned at this meeting that Larranaga was to be given the cash award the following month. *See id.* at ¶13; *Plf. Aff.* at 2. Burfield immediately complained about the cash award going solely to Larranaga since she had defined the problems and initiated the work to plan a new system. *Plf. Aff.* at 2; *see also Complaint,* CIV 01-199 ¶ 13. Burfield again told Radke that the cash award supported her belief that he was treating the men in the office more favorably. *Plf. Depo.* at 53. Radke responded that the award for Larranaga was for his

---

[2] In his declaration Radke claims the Larranaga "award was not based solely" on his work on the communication system, but also on initiating and completing "a number of major Refuge projects," supervising fire and maintenance crews, consistently working extra hours, and receiving outstanding performance reviews. *Radke Decl.* ¶ 6. The language he used to justify the award, however, does not clearly convey that point. One can read the justification as indicating that Radke made the award because Larranaga took on the communications project despite "his many other complex duties." *Id.,* Attachment A. In light of the disposition of this matter, it is immaterial whether the award was made solely for the communications project.

5

work with the Fire Office and that "regular staff members would received (sic) their awards at the end of the year as usual." *Plf. Aff.* at 2. Plaintiff also complained about Roberts having been hired as an assistant. From her affidavit, it appears that Plaintiff believed Roberts created more work for her because he was also a firefighter and did not have "warrant authority." *Plf. Depo.* at 127-28; *Plf. Aff.* at 6, 8.

In May 1997, Plaintiff became even more angry when she wanted to attend a "fire timekeeping training" course, but Radke told her he intended to send Roberts instead. Radke indicated that Roberts was primarily responsible for fire timekeeping input and there were only enough funds to send one person. Plaintiff told Radke that she thought something "funny" was going on. Burfield admits, however, that she was permitted to attend this training the following year. *See Plf. Depo.* at 58-64, 69.

### D. *November 1997 Negative Performance Evaluation*

On November 6, 1997, Radke evaluated Plaintiff's performance for that fiscal year as unsatisfactory by rating her "Not Achieved." Before he advised Plaintiff of the rating, he consulted with his supervisor, Renee Lohoefener, and an employee relations specialist, Nancy Jarrett. They advised Radke to place Plaintiff on an performance improvement plan ("PIP"), which he began drafting. *Radke Decl.* ¶ 14.

According to Radke's affidavit, at the November 6th meeting, he discussed the specific items he had listed in the evaluation. Although Plaintiff "agreed with [his] assessment of the shortcomings in her performance," she disagreed with the overall evaluation of "Not Achieved" and wanted time to respond. *Radke Decl.* ¶ 15. On December 1, 1997, she responded to Radke's evaluation in a "lengthy written response in the form of a grievance" in which she admitted she

6

had "problems completing tasks" but also "attempted to dismiss or explain each of the supporting issues . . . [Radke] used to justify her unacceptable performance." *Radke Decl.* ¶ 16. The next day, Radke met with Ms. Jarrett regarding Plaintiff's grievance and his draft PIP. *Id.*

### *E. EEO Counseling and Increased Contentiousness Between Plaintiff and Radke, Culminating In The Alleged "Arm Grab" Incident*

Because Plaintiff was on annual leave on November 11, 1997, Radke took responsibility for the distribution of a memorandum from the regional office concerning early retirement. Plaintiff concedes that she would have been responsible for distributing the information had she been at work. Radke distributed a copy via e-mail to Plaintiff as well as a paper copy. *Radke Decl.* ¶ 9; *Complaint, CIV 00-990* ¶ 10.g.; *Complaint CIV 01-199* ¶ 17. Plaintiff interpreted Radke's distribution of the retirement information to her in both electronic and hard copy form as a harassing and discriminatory suggestion that she voluntarily retire. Burfield does not dispute, however, that she was supposed to receive the information and that Radke also gave hard copies to "every staff person at the Refuge." *Radke Decl.* ¶ 9.

This event and the unsatisfactory evaluation prompted Plaintiff to consult with EEO counselor William Green sometime in mid-November. Without identifying the source of her information, Plaintiff states that she "understands" Green interviewed Radke "shortly thereafter." *Plf. Aff.* at 2. Radke's affidavit testimony, however, establishes that the first time he spoke with Green and learned that Plaintiff had consulted an EEO counselor was on January 13, 1998. *Radke Decl.* at ¶ 17.

Radke's supervisor, Lohoefener, also became directly involved in dispute as part of the EEO pre-complaint conciliation phase. *See Doc. 32,* Green Decl. at ¶¶ 2-3 (hereinafter "*Green Decl.*"). Lohoefener arranged a February 26, 1998 meeting with himself, Plaintiff, Radke, and

7

Shirley Mondy, a conflict resolution specialist. *Radke Decl.* at ¶ 18. Lohoefener told Radke three days before the meeting to put the potential PIP and Plaintiff's 1998 performance standards "on hold" until after that meeting. *Id.* at ¶ 18.

Neither party mentions this, but the timing of this meeting was possibly related to Plaintiff's February 17, 1998 accusation that Radke was involved with an "illegal contract." According to Burfield, the contracting office asked her to issue a purchase order for a certain contract. She evidently questioned this request because she characterized the contract as "construction," and the work for the contract was already complete. *See Plf. Aff.* at 3; *Complaint,* CIV 99-990 ¶ 10.h; *Complaint,* CIV 01-199 ¶ 18.

On the morning of the February 26th meeting, Radke went to Plaintiff's office asking why she characterized the contract as construction and asked to see the file. Burfield retrieved the file, handed him the acquisition papers out of it and then proceeded to tear up the purchase order that had not been issued. Plaintiff claims Radke grabbed her arm to keep her from tearing up what he called "evidence." Burfield called for help and eventually they agreed to put the torn document into an envelope to be held by a third party until Lohoefener arrived for the meeting.

Plaintiff admits that the alleged touch by Radke was in an effort to stop her from destroying the paper and was not of a sexual nature or due to her age. She does believe, however, that he would not have grabbed her arm had she not been a female. *See Plf. Depo.* at 101-04, 110-12; *Plf. Aff.* at 4. It does not appear that Plaintiff claims that she was physically injured by the incident. In his affidavit, Radke categorically denies touching her. *Radke Decl.* at ¶ 10

### F. February 26th Meeting And Negotiated Resolution Of 1997 Performance Evaluation

Lohoefener and Mondy first met with Plaintiff and Radke separately, and then they all met as a group. *Radke Decl.* at ¶ 18. During her private meeting, Burfield says that she told Lohoefener she could not work with Radke and that Lohoefener responded "there were no other jobs and that we would have to work this out." *Plf. Aff.* at 4. Lohoefener decided to change the November 1997 "Not Achieved" rating to "Achieved" at the February 26th meeting.[3] *Plf. Aff.* at 4-5. Lohoefener made the decision to change the designation not because he believed that Plaintiff's performance had been satisfactory. Rather, he found the May 1997 review had not been adequately documented and that Radke and Plaintiff failed to sufficiently communicate in the past year.

Also at the February meeting all agreed on a set of five functions critical to Plaintiff's job. They established an "interim 90-day performance plan for FY 1998." The objectives of the plan were to "document [Plaintiff's] workload, identify problem areas, and ensure frequent communication between supervisor and employee." They also set up interim 30-day evaluation periods, which would result in a meeting with all four participants. The first such meeting was to be conducted on April 10, the last on July 7, 1998. *Doc. 34,* Exh. 2; *see also Plf. Depo.* at 211; *Plf. Aff.* at 4-5; *Radke Decl.* at ¶¶ 18-21; *Green Decl.* at ¶ 4.

---

[3] Plaintiff's Complaints ascribe April 8, 1998 as the date of Lohoefener's decision as well as the date she filed a "formal" EEO charge. *See Complaint CIV 00-990,* ¶ 18; *Complaint CIV 01-199,* ¶ 39. The properly supported undisputed facts including Plaintiff's affidavit, however, do not support April 8th as the relevant date for either. Lohoefener's letter memorializing what transpired at the February 26th meeting was sent from Lohoefener to Radke on April 8th, *Doc. 34,* Exh. 2. Plaintiff executed her first EEO complaint on March 30, 1998 just before her first interim evaluation described later. *Doc. 35,* Exh. A.

9

### G. Plaintiff's Performance Did Not Improve

Burfield's performance was not satisfactory at any of the interim 30-day periods. *See Plf. Depo* at 195-96; *Radke Decl.* at ¶ 22. Mondy personally observed Plaintiff's performance at the end of the ninety-day review period in July 1998, determined that Burfield's performance was deficient and recommended that she be placed on a performance improvement plan ("PIP"). Lohoefener then placed Plaintiff on an official 90-day PIP on July 13, 1998. *See Radke Decl.* ¶ 24; *Doc. 32,* Mondy Depo. at 27-28.

During the formal PIP period Radke made a series of detailed evaluations of Plaintiff's performance. Although she was performing satisfactorily in some areas, in other areas (such as paying bills and reconciling the finances), she showed deficient performance. In November 1998, Lohoefener proposed that Plaintiff be fired, and Deputy Regional Director Geoffrey Haskett did so effective January 28, 1999. *See Radke Depo.* at ¶¶ 23-27. Plaintiff does not dispute that her performance was unsatisfactory during 1998.[4] Indeed, Plaintiff states that "[a]t that time I decided that I would only do as much work as I could during the normal workday. I was missing my college classes by working so many hours." *Plf. Aff.* at 7.

## III. Analysis

### A. Abandoned Claims – Plaintiff Is Only Claiming Discriminatory Discharge Based On Gender/Age And Retaliation For Placing Her On PIP In July 1998

---

[4] The response asserts that Plaintiff was "qualified" for the position. In support of this conclusion, the response cites to the parts of Plaintiff's affidavit where she notes she presented Radke with a list of her accomplishments prior to her November 1997 review and where she notes Lohoefener's compromise change of "Not Achieved" to "Achieved." Nowhere does her affidavit aver that her 1998 performance was satisfactory or dispute that she was having problems completing tasks earlier before the 1997 negative review.

Liberally reading Counts I of both Complaints, Plaintiff alleges that based on her age and gender, she was subjected to discriminatory discharge, discriminatory treatment and a "hostile intimidating work environment." In Plaintiff's response, she clarifies that she asserts a retaliation claim based only on her termination in July 1998. She alleges discriminatory treatment based on: (1) not raising her grade; (2) giving Larranaga the cash award; (3) sending Roberts to timekeeper training first; (4) the arm-grab incident; (5) Radke's November 1997 evaluation; (6) Radke giving her early retirement materials; (7) placing her on the PIP in 1998; (8) hiring Roberts instead of promoting Plaintiff; (9) appointing Larranaga as network manager; and (10) Roberts' promotion.

As to the first seven allegations, Defendant argues that: Plaintiff failed to exhaust the first three charges; the fourth, fifth and sixth charges do not constitute adverse employment actions; and the isolated arm-grab incident does not constitute a hostile work environment. Defendant further contends that it has come forward with legitimate reasons for the above actions towards Plaintiff and demonstrated by admissible evidence that the actions were justified. I agree. Finally, Defendant argues that Plaintiff fails to present sufficient evidence of pretext from which a jury could conclude that these actions were motivated by an unlawful discriminatory or retaliatory animus.

Plaintiff fails to respond to the exhaustion, adverse employment action, hostile work environment, or legitimate reasons arguments in her response. By failing to respond to these arguments, Plaintiff can be deemed to have abandoned her claims.[5] Even if Plaintiff could be found

---

[5] In short, the nonmovant must carry its burden in the district court in a timely fashion pursuant to Rule 56(e) and *Celotex* or explain why it cannot pursuant to Rule 56(f). *See* FED. R. CIV. P. 56(e), (f). Otherwise, the nonmovant acts, or fails to act, at its peril. The burden is not an onerous one for the nonmoving party in each case,

11

to have exhausted and preserved these claims, I find: the hostile environment claim to be without merit; [6] the arm-grab incident, the negative November 1997 evaluation, and receipt of early retirement materials do not constitute "adverse employment actions" under Tenth Circuit precedent; and Plaintiff has failed to present evidence of pretextual motive as to these or any other claims of discriminatory treatment.

### B. The Discriminatory and Retaliatory Discharge Claims

The Tenth Circuit has repeatedly cautioned that plaintiff's burden at the *prima facie* stage should not be "onerous." *Ortiz v. Norton,* 254 F.3d 889, 895 (10th Cir. 2001). Plaintiff contends that she has presented direct evidence of pretext. She *alleges* that Radke did not "cooperate" in

---

> but does not at any point shift from the nonmovant to the district court.

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 672 (10th Cir. 1998); *see also id.* at 670-71. Indeed, where legal argument and support are absent, courts should be "wary of becoming advocates who . . . make a party's case for it." *Id.*

[6] The defense assumes that the hostile work environment claim is based on the alleged arm-grabbing incident, which Plaintiff does not dispute. The arm-grabbing incident, in isolation or in conjunction with the other cited conduct, is insufficiently pervasive to constitute a objective and subjective abusive environment. *Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1243 (10th Cir. 2001); *see also Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1972 (10th Cir. 1998); *Campbell v. United States Postal Serv.,* 151 F. Supp. 2d 1284, 1291 (D. Kan. 2001) (work-related arm- and wrist-grabbing incidents where neither the plaintiff nor the evidence suggested they were based on gender while 'may have been inappropriate and even frightening for plaintiff . . . however, simply does not constitute discrimination 'because of sex.'"). "To survive summary judgment under Title VII, the record must support an inference of a [sexually] hostile work environment ***and*** a basis for employer liability." *Ford v. West,* 222 F.3d 767, 775 (10th Cir. 2000) (emphasis in original). There is nothing in the record other than Plaintiff's own suspicions that the conduct was age- or gender-based. that could suggest a basis for employer liability for a hostile environment claim. *E.g., Ford,* 222 at 775; *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1263 (10th Cir. 1998) ("'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.'" *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir. 1994)), *cert. denied*, 526 U.S. 1039 (1999).

12

the 1998 PIP effort to improve her performance, but has submitted no evidence in support of that proposition. Nevertheless, under the *McDonnell-Douglas* analysis, I find Plaintiff meets her *prima facie* stage burdens for creating an inference that her discharge was based on gender, age and retaliation.[7]

The burden now shifts to Defendant who bears the burden of offering facially non-discriminatory reasons for placing Plaintiff on a PIP and for deciding to terminate Plaintiff in 1998. *E.g., English,* 248 F.3d at 1007; *Munoz v. St. Mary-Corwin Hosp.,* 221 F.3d 1160, 1167 (10th Cir. 2000); *Kendrick,* 220 F.3d at 1225-30; *Pastran v. K-Mart Corp.,* 210 F.3d 1201, 1205 (10th Cir. 2000). Defendant clearly has satisfied this burden.

### *C. Plaintiff Fails To Establish Pretext*

Plaintiff must now come forward with sufficient admissible evidence that the reasons given are a pretext for unlawful motivation for her termination. Plaintiff must show that a

---

[7] To establish a *prima facie* case of discriminatory discharge, Plaintiff must show that: "(1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1229 (10th Cir. 2000). Plaintiff's long-standing employment with Defendant satisfies the "qualifications" second and third prongs. *English v. Colorado Dept. of Corrections,* 248 F.3d 1002, 1008 (10th Cir. 2001). The record further establishes that Plaintiff meets the first and fourth prongs as well.

As for the ADEA claim, Plaintiff must demonstrate the following: (1) at the time she was fired, she was a member of the class protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)); (2) she was otherwise qualified for the position; (3) she was discharged; and (4) her replacement was substantially younger. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000). The record establishes Plaintiff meets the first and third prongs and there is no argument as to the fourth prong. I find she meets the second prong based on the analysis in another recent decision of this Court in *Cordova v. PNM,* CIV 00-1328 KBM/DJS (*Doc. 63* filed 10/10/01).

For her retaliation claim, Plaintiff must show that the July 1998 decision to place her on a PIP, Defendant concedes she meets the elements. *See Doc. 32* at 24 ("Although Plaintiff can establish a *prima facie* case of retaliation, she cannot overcome Defendant's legitimate nondiscriminatory explanation for its actions.").

"discriminatory reason more likely motivated the employer or . . . that the employers proffered explanation is unworthy of credence." *Bullington v. United Air Lines, Inc.,* 186 F. 3d 1301, 1317 (10th Cir. 1999) (quotations and citations omitted). "Pretext can be shown by such weaknesses, implausibilities, incoherencies, or contradictions in the employers proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F. 3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted), *see also e.g., Munoz,* 221 F.3d at 1167.

Plaintiff maintains that Radke harbors discriminatory animus toward her based on her gender and age. Under Plaintiff's theory, this is evidenced by: his failure to persuade Mazzoni to give her a grade raise (despite his legitimate reasons for denying the increase and despite no evidence of precedent for such a raise); his hire of a "fireman" as an assistant (despite the fact that the Fire Office was going to share space in the facility); his failure to send her to fire timekeeping training first (despite that was not her initial responsibility at the time and there were no funds to send two people); and Radke's poor evaluation in November 1997 with Lohoefener noting "something" changed in 1997 (despite no dispute that her performance was questionable).

Plaintiff argues that these incidents should not be viewed in isolation but as a series of events giving rise "to an inference that Radke got rid of Plaintiff because she was an older 'uppity' female who was upsetting the male dominance and control" of the Refuge. *Doc. 34* at 7. There are no reasonable inferences in Plaintiff's favor to be drawn from the totality of these events, however, given the undisputed legitimate justifications for each action.

14

Moreover, even if Radke was unlawfully motivated, it is undisputed that Lohoefener, *not Radke*, made the July 1998 decision to place Plaintiff on a formal PIP and the later decision to fire her when her performance did not improve. Lohoefener decided to place Burfield on a formal PIP not only based on Radke's assessment but after Mondy's independent evaluation of Plaintiff's performance. Lohoefener's decisions were also guided by his own participation in several interim meetings with both Plaintiff and Radke. There is simply no evidence to that Lohoefener was a "rubber stamp" for Radke's allegedly discriminatory motives. *E.g., English,* 248 F.3d at 1011; *Kendrick,* 220 F.3d at 1231. These observations are fatal to Plaintiff's assertion of pretext.

Finally, the procedures employed in 1998 to assess Plaintiff's performance belie any argument of pretextual cover-up for unlawful discrimination or retaliation. The initial decision to place Burfield on a PIP was made before she filed her discrimination charge, and she was not placed on a formal PIP until after the evaluation team had determined her core job functions. The PIP was implemented to enable an objective, timely method for measuring her job performance. Burfield was given the opportunity to improve her performance and admittedly failed to perform to her superior's expectations.

Thus, even considering the *prima facie* cases and other evidence Plaintiff asserts, the "inferences properly drawn therefrom . . . even absent additional, independent evidence of discrimination or other unlawful intent" are so one-sided as to warrant summary judgment for Defendant on the Title VII claims. *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1123 (10th Cir. 2001) (internal quotations and citations omitted).

Wherefore,

**IT IS HEREBY ORDERED** that:

(1) Defendant's motion for partial summary judgment is hereby GRANTED;

(2) Counts I and II of the Complaints in both CIV 99-990 KBM/DJS – ACE and CIV 01-199 KBM/DJS – ACE are hereby dismissed with prejudice; and

(3) The pretrial conference set for December 10, 2001 and jury trial setting for January 14, 2002 are hereby VACATED; and

(4) The parties brief the remaining administrative claim as follows: Plaintiff's brief to be filed no later than January 14, 2002; Defendant's response no later than February 13, 2001; and Plaintiff's reply no later than February 28, 2002. The parties may agree to expedite this schedule.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.